DISTRICT COURT
**F I L E D**

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

NOV 2 6 2007

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

| | |
|---|---|
| **BRIAN K. ROGERS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  Case No. _CJ 2007 07863_ |
| | )  [Attorney Lien Claimed] |
| **DONALD C. YONCE, and** | ) |
| **SOLARWINDS.NET, INC.,** | ) |
| **an Oklahoma corporation,** | )  DEBORAH C. SHALLCROSS |
| | ) |
| **Defendants.** | ) |

## PETITION

Plaintiff Brian K. Rogers ("B.K. Rogers" or "Rogers"), for his Petition against Defendants Donald C. Yonce ("D. C. Yonce" or "Yonce") and SolarWinds.Net, Inc., an Oklahoma corporation ("SolarWinds"), alleges and states as follows:

1.   Plaintiff B.K. Rogers and Defendant D. C. Yonce are both residents and citizens of Tulsa County, Oklahoma.  Defendant SolarWinds is an Oklahoma corporation doing business in Tulsa County, Oklahoma.  The events that gave rise to this cause and controversy, and that are the basis of Plaintiff Rogers' claims against these Defendants, primarily occurred in Tulsa County, Oklahoma.

2.   This Court has jurisdiction of the subject matter of this action, and venue is proper in this Court.

3.   Plaintiff Rogers is a computer network engineer and software developer-designer who first met Defendant D. C. Yonce in or about 1997 when they worked together at International Network Services ("INS") in Tulsa.

4.   In the course of working together at INS, Rogers and Yonce became good friends, both socially and professionally.  For example, as Plaintiff's senior, Defendant Yonce effectively



**EXHIBIT**

1

became Rogers' mentor at INS, and over time they developed a special relationship of confidence, mutual reliance, and deep personal trust.

5.     Before Rogers and Yonce ceased their respective employment(s) at INS, they each achieved the unique distinction and professional status of "Principal Consultant" the highest level of accomplishment that a network engineer/consultant could achieve at INS.

6.     In or about 2000, Plaintiff Rogers went to work for Greenwich Technology Partners ("GTP") as a Principal Consultant. About this same timeframe, Defendant Yonce caused his new business endeavor, Defendant SolarWinds, to be organized.

7.     While Plaintiff Rogers was working at GTP, he and Defendant Yonce continued their personal friendship and professional collaboration. For example, while he was employed at GTP, Plaintiff Rogers used part of his personal vacation time to assist Yonce promote his new business endeavor at a computer tech trade show in Las Vegas, Nevada, all without compensation.

8.     In 2001, Defendant Yonce approached Plaintiff Rogers about coming to work for him full-time at SolarWinds, the computer software and technology business that Yonce had recently begun.

9.     Defendant SolarWinds' business involves providing computer network management software, network monitoring software and network discovery software, as well as related maintenance and support services, for various customers.

10.    Defendant Yonce was the founder, principal or sole owner of SolarWinds, as well as its President or senior executive officer.

11.    Because SolarWinds was still just a small start-up venture with few employees, Defendant Yonce asked Rogers to accept a substantial cut-in-pay and benefits from the

compensation package that Rogers was then receiving at GTP.

12.     Defendant Yonce persuaded Rogers to give up his existing job at an established company (GTP), and to switch to a lower-paying job at Yonce's new start-up company (SolarWinds), by also offering Rogers other potentially valuable economic inducements.

13.     Specifically, during a meeting in Tulsa in or about September-October 2001, Defendant Yonce promised his friend that if Rogers joined him and helped grow SolarWinds, Plaintiff Rogers would receive substantial financial compensation from Yonce's projected sale of the business.

14.     Defendant Yonce promised and represented to Rogers that when such sale occurred, they would "all" become "millionaires".

15.     By his statements, Defendant Yonce intended for Rogers to understand and believe -- and Rogers reasonably understood Yonce to be offering and promising -- that if Rogers joined him at SolarWinds, and together they worked to jointly grow the business so it could be successfully sold, Rogers would receive a substantial monetary share from the sale, sufficient for Rogers to achieve a net worth of at least $1 million.

16.     Rogers reasonably relied on Defendant Yonce's representations and promises. Based on Yonce's statements, Plaintiff Rogers accepted the offer of employment as described above, thus giving up substantial salary, medical, and other benefits at GTP, and thereby creating a binding agreement.

17.     Consequently, Plaintiff Rogers changed his place of employment from GTP to Defendant SolarWinds in Tulsa, Oklahoma, where he commenced his new job in the latter half of 2001.

18.     Defendant SolarWinds adopted, ratified and affirmed the above-described

3

employment agreement and compensation-related promises made by Defendant D.C. Yonce to Plaintiff Rogers.

19.     Plaintiff Rogers remained continuously employed at Defendant SolarWinds for the next five (5) years, until December 2006, and at all times Plaintiff fully performed the duties and requirements of his job.

20.     As SolarWinds' Senior Technologist reporting directly to Defendant Yonce, Plaintiff Rogers' work at SolarWinds routinely included his conception, invention, development, design, and personal creation of highly valuable software programs and related computer technology that SolarWinds successfully exploited through products that it commercially licensed to others.

21.     During his employment, Defendant SolarWinds directed Plaintiff Rogers to execute a "SolarWinds.Net Employee Proprietary Information And Inventions Agreement" (the "Inventions Agreement" or "Agreement"). A true and correct copy of the executed Inventions Agreement is attached hereto as Exhibit "A".

22.     The Inventions Agreement was duly executed by both SolarWinds and Rogers.

23.     Pursuant to the Inventions Agreement, Rogers and SolarWinds mutually promised and agreed, in connection with Rogers' employment, that as to any company intellectual property relating to SolarWinds' business that Plaintiff Rogers created and thus was author of, SolarWinds would be a "co-author" along with Rogers of any such intellectual property.

24.     While he was SolarWinds' Senior Technologist, Plaintiff Rogers regularly conceived of, developed, invented, authored, and created valuable technology and software-related original works of authorship relating to SolarWinds' business. Under the Inventions Agreement Plaintiff Rogers and Defendant SolarWinds are co-authors and co-owners

4

of all such creations, inventions, and original works (collectively referred to as the "Rogers/SolarWinds Intellectual Property").

25.     For example, Plaintiff Rogers is co-author (with SolarWinds) and co-owner of the proprietary rights to the Software Licensing and Licensing Verification System used by SolarWinds that Rogers created and/or developed.

26.     The SolarWinds' Software Licensing and Licensing Verification System (or "Licensing System") is a collection of computer software components that protect SolarWinds' software so only authorized customers who have paid or who have been granted usage rights to use SolarWinds's software applications are allowed to run the SolarWinds' software applications.  The Licensing System is a software equivalent to a "lock and key" security mechanism in which only authorized licensed users are given a textual string (or "License Key") that unlocks the software application for use.  The Licensing System is comprised of a number of software components such as a Key Client, Key Distribution Server, and a Key Management Server.

27.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Software Licensing Key Client, technology/software used by SolarWinds that Rogers also created and/or developed.

28.     The SolarWinds' Software Licensing Key Client (or "Key Client"), as part of the SolarWinds' Software Licensing and Licensing Verification System, is a component of computer software code, incorporated into almost all SolarWinds' product lines ("Orion", "Toolset", and "Cirrus") which verified that the application is authorized by SolarWinds to run on the computer on which the software application is installed.  The Key Client compares a self-generated text string (or "Installation Serial Number"), which identifies the computer that the software

application is installed on, with a mathematically-related textual string, ("License Key") issued by SolarWinds upon purchase. If a License Key does not fit the mathematical relationship or does not exist on the computer, the software application will not run. If a valid License Key does not exist on the computer, the Key Client also has the ability to prompt the computer user for a customer identification information, request a new License Key via the Internet from a Key Distribution Server, and then save the License Key on the computer for future use.

29.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Software Licensing Key Distributing Server, technology/software used by SolarWinds that Rogers also created and/or developed.

30.     The SolarWinds' Software License Key Distribution Server (or "Key Distribution"), as part of the SolarWinds' Software Licensing and Licensing Verification System, is a computer software application that listens for requests via the Internet from Key Clients, decodes, validates and forwards the request to a Key Management Server. The Key Distribution Server provides a frontline security defense for the Key Management Server. The Key Distribution Server then waits for a reply from the Key Management Server. When the reply is received from the Key Management Server, the reply is formatted into a response the Key Client can read, and then returned back to the Key Client via the Internet.

31.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Software Licensing Key Management Server, technology/software used by SolarWinds that Rogers also created and/or developed.

32.     The SolarWinds' Software Licensing Key Management Server, as part of the SolarWinds' Software Licensing and Licensing Verification System, is a computer software application that receives Software License Key Requests from a Key Distribution Server,

6

validates the included customer identification, checks the customer's account status, and using a set of business logic rules, decides if a License Key should be issued. If a License Key should be issued, a License Key is mathematically calculated from the Client's Serial Number and the License Key is returned to the Key Distribution Server. If a key is not issued, a message telling why the account was denied a new License Key is returned to the Key Distribution Server.

33.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Network Performance Monitor System, technology/software that Rogers also created and/or developed.

34.     The Orion Network Performance Monitor (also known as "Orion NPM") is a complex computer software system comprised of several computer software applications. The computer software applications work together to monitor the health of computers and computer network hardware, maintains a history of the health measurements, and alerts people if the health is below acceptable levels. The Orion NPM also allows users to query the historical data of health measurements, displaying charts and historical graphs of the history of the monitored devices. The Orion NPM also receives system logging and alerting messages, transmitted via a computer network, from computers and computer network hardware, records these messages in a historical database, and can alert people if specific messages are received.

35.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Network Performance Monitor Polling Engine (all editions), technology/software that Rogers also created and/or developed.

36.     The Orion Network Performance Monitor Polling Engine ("Polling Engine"), as part of the Orion Network Performance Monitor System, is a software application that measures the health of network-attached computers and network infrastructure devices ("routers" and

"switches"). The collected health statistics are stored in a database so the Orion System Manager and the Orion Web can retrieve and display the historical graphs and analysis. The Polling Engine also passes messages and statistics to the Orion Standard Alerting Engine, which can alert people via email or text pager or alert other computers when abnormal behavior is observed.

37.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Database Structure, technology/software that Rogers also created and/or developed.

38.     The Orion Database Structure, as part of the Orion Network Performance Monitor System, is a database structure used to store status and historical information about devices monitored by the Polling Engine, Syslog Service, Trap Service, Netflow Service, Broadband Cable Modem Management Poller, Wireless Network Polling Service, and all configuration information for the Web Site and Alerting Engines.

39.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion System Manager, technology/software that Rogers also created and/or developed.

40.     The Orion System Manager (or "System Manager"), as part of the Orion Network Performance Monitor System, is a computer application that provides for the main administration and configuration of the Orion Network Performance Monitor System.   The System Manager provides a way to designate which computer network attached devices (computers and computer network infrastructure devices like routers or switches) are monitored, how often the devices are checked, and what actions should be taken if a problem is detected. The System Manager can display historical graphs based on the collected historical statistics in the database.

8

41.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Web Site, technology/software that Rogers also created and/or developed.

42.    The Orion Web Site, as part of the Orion Network Performance Monitor System, is a computer software application that generates web pages for people to remotely view the information, status, and historical statistics collected by the Orion Network Performance Monitor System via a web browser.

43.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Installation and Configuration Wizard, technology/software that Rogers also created and/or developed.

44.    The Orion Installation and Configuration Wizard, as part of the Orion Network Performance Monitor System, is a computer software application that simplifies the installation procedure for all the software application components of the Orion Network Performance Monitor System. After asking a few simple questions, the Configuration Wizard performs a web site installation, security setup, database setup, user configuration, and installation of each of the polling engines within the Orion Network Performance Monitor System.

45.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Database Manager Utility, technology/software that Rogers also created and/or developed.

46.    The Orion Database Manager Utility, as part of the Orion Network Performance Monitor System, is a computer software application that provides a way to administrate the database. Example of tasks done to administrate a database are scheduling automated backup jobs, and restoring a database from a backup copy.

9

47.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Database Structure Installation and Repair Component, technology/software that Rogers also created and/or developed.

48.     The Database Structure Installation and Repair Component, as part of the Orion Installation and Configuration Wizard, is a computer software component that creates an Orion database based on a textual file which describes the structure, tables, fields, indexes, and default values needed for an Orion database.   The component can also analyze an existing Orion database and using the textual file as a guide, intelligently repair the database structure as needed.   This code component is also imbedded in the Orion Database Manager Utility and is used to generate the textual file from an existing database.

49.     Plaintiff Rogers is also the co-author (with SolarWinds) and the co-owner of the proprietary rights to the Orion Database Maintenance Utility, technology/software that Rogers also created and/or developed.

50.     The Orion Database Maintenance Utility, as part of the Orion Network Performance Monitor System, is a computer software application that automates the summarization of historical data.   In the Orion Network Performance Monitor System, newly collected historical statistics are recorded in the database by a Polling Engine every few minutes. After the minute by minute statistics are a few days old, to save database space, the minute by minute historical statistics are statistically summarized into an hourly statistic and re-written to the database. At a later time (weeks or months), hourly data is summarized into daily values. At a later time (possibly after a year), very old historical statistics are deleted from the database. The Orion Database Maintenance Utility performs this process.

51.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the

proprietary rights to the Orion Database Maintenance Scripting Language, technology/software that Rogers also created and/or developed.

52.     The Orion Database Maintenance Scripting Language, as part of the Orion Database Maintenance Utility, provides the rules and instructions for summarizing historical statistics.   When a new type of historical statistics was added to the Orion System, the Maintenance Scripting Language provides a way to change or add new rules for historical data summarization.

53.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Database Migration Tool, technology/software that Rogers also created and/or developed.

54.     The Orion Database Migration Tool, as part of the Orion Network Performance Monitor System, is a computer software application that provides a way to move or copy historical data from one Orion database to another Orion database.   The Orion Database Migration Tool also allowed two databases to be merged together.

55.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Broadband Cable Modem Management Poller, technology/software that Rogers also created and/or developed.

56.     The Orion Broadband Cable Modem Management Poller, as part of the Orion Network Performance Monitor System, is a computer software application that is designed to retrieve historical statistics and status information about Cable Modem networks.   A Cable Modem network is a computer data network built on cable TV coaxial cable for providing very high speed internet access.   A Cable Modem network consists of a "Cable-Headend Router" which is used by cable TV internet providers to send and receive data via coaxial cable TV lines

11

to/from "Cable Modems" located in homes of cable TV subscribers. The Cable Modem Management Poller retrieves status and historical statistics from both the Cable Headend Router and from subscriber Cable Modems, and stores the status and statistics in the Orion database.

57.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Syslog Message Collector Service, technology/software that Rogers also created and/or developed.

58.   The Orion Syslog Message Collector Service ("Syslog Service"), as part of the Orion Network Performance Monitor System, is a computer software application that receives system logging ("Syslog") messages. Syslog messages are used to communicate system events from computers and computer network infrastructure devices (for example "routers" and "switches"). The Syslog Service can analyze, alert, forward, and store Syslog messages in the Orion Database for later display in the Orion Syslog Viewer or the Orion Web Site.

59.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Syslog Message Address Pre-scanning Filter, technology/software that Rogers also created and/or developed.

60.   The Orion Syslog Message Address Pre-scanning Filter, as part of the Orion Syslog Message Collector Service, is a software code component that uses pattern matching to locate Internet Protocol Addresses ("IP Addresses"), for example 192.168.1.1, and Media Access Control Addresses ("MAC Addresses"), for example 0a:bc:dd:01:02:03, located within the text of a syslog message. The located IP Addresses and Media Access Addresses are stored in separate database fields along with the syslog message. Storing the IP Address and MAC Address separately gives a dramatic performance boost when searching for syslog messages.

61.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the

proprietary rights to the Orion Trap Collector Service, technology/software that Rogers also created and/or developed.

62.     The Orion Trap Collector Service ("Trap Collector"), as part of the Orion Network Performance Monitor System, is a software application that receives Simple Network Management Protocol event messages, referred to as SNMP Traps.  SNMP Trap messages are used to communicate system events from computers and computer network infrastructure devices (for example "routers" and "switches").  The Service can analyze, alert, forward, and finally store SNMP Trap messages in the Orion Database for later display in the Orion Trap Viewer or the Orion Web Site.

63.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Netflow Collector Service, technology/software that Rogers also created and/or developed.

64.     The Orion Netflow Collector Service, as part of the Orion Network Performance Monitor System, is a software application that receives Netflow messages and saves the statistical data contained within the message in the Orion database.  Newflow message format is defined by Cisco Systems, Inc. and provides accounting information about what devices are talking to each other, how they are saying it, and how much is being said.

65.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Windows Event Log To Syslog Message Service, technology/software that Rogers also created and/or developed.

66.     The Orion Windows Event Log To Syslog Message Service, as part of the Orion Network Performance Monitor System, is a software application that monitors a Microsoft Windows Event Log Manager for logging of new event messages, converts newly logged event

messages into standard syslog messages, and transmits the syslog message to an Orion Syslog Service so the messages can be analyzed and stored for later display.

67.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Standard Alerting Engine, technology/software that Rogers also created and/or developed.

68.     The Orion Standard Alerting Engine, as part of the Orion Network Performance Monitor Polling Engine, is a software module that receives status and statistical information about computers and network devices monitored by the Orion Poller. The status and statistics are checked against a set of thresholds and if a threshold is met, an alerting message is set to a person or other computer.

69.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Advanced Alerting Engine, technology/software that Rogers also created and/or developed.

70.     The Orion Advanced Alerting Engine, as part of the Orion Network Performance Monitor System, is a software application that periodically executes a defined set of searches against the Orion database. If a list of devices that match the search is returned, the service begins a process of alerting people about the matched condition. The Advanced Alerting Engine also alerts people when the condition has cleared. The Advanced Alerting Engine allows for extremely complex rules, compared to the Standard Alerting Engine, to be defined for when an alert condition matches.

71.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Host Standby Polling Engine, technology/software that Rogers also created and/or developed.

14

72.    The Orion Host Standby Polling Engine, as part of the Orion Network Performance Monitor Polling Engine, is a software module that allows a polling engine to monitor other polling engines and assume their identity and roll for network polling.

73.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Wireless Network Polling Service, technology/software that Rogers also created and/or developed.

74.    The Orion Wireless Network Polling Service, as part of the Orion Network Performance Monitor System, is a computer software application that is designed to retrieve historical statistics and status information about Wireless, also referred to as WiFi or 802.11, based computer networks.  A typical wireless-based network has a hardware device called wireless access point that provides the bridge between the wireless network and a non-wireless network and computers with compatible wireless transmitters.  The Wireless Network Polling Service retrieves status and historical statistics from the wireless access point and stores the status and statistics in the Orion database.

75.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Wireless Polling Engine Schema Language, technology/software that Rogers also created and/or developed.

76.    The Orion Wireless Polling Engine Schema Language, as part of the Orion Wireless Polling Engine, is a textual file that describes how to retrieve information from a wireless device, how to correlate the information retrieved, how to calculate any values, and finally where to write the information into the Orion database.  The Polling Schema Language allows for the Wireless Poller to be programmed from a text file instead of hard coding from within the Wireless Polling Engine.

15

77.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Orion Custom Poller, technology/software that Rogers also created and/or developed.

78.     The Orion Custom Poller, as part of the Orion Network Performance Monitor System, is a derived work from a prototype Orion Polling Engine created and/or developed by Rogers.

79.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the SolarWinds' Toolset Suites, technology/software that Rogers also created and/or developed.

80.     The SolarWinds' Toolset Suites is a set of computer software applications that provide the ability to monitor, troubleshoot, diagnose, and configure computers and computer networking hardware devices.

81.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Advanced CPU Load Tool Utility, technology/software that Rogers also created and/or developed.

82.     The Advanced CPU Load Tool Utility, as part of the SolarWinds' Toolset Suites, is a software application that measures the processing load, or how busy, the central processor is within a computer or network device.

83.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Advanced Subnet Calculator Utility, technology/software that Rogers also created and/or developed.

84.     The Advanced Subnet Calculator Utility, as part of the SolarWinds' Toolset Suites, is a software application that helps calculate a subnet masks.  A subnet is a partition of an

16

Internet Protocol ("IP") address range. A subnet mask defines the size of the partition.

85.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Bandwidth Gauges Utility, technology/software that Rogers also created and/or developed.

86.     The Bandwidth Gauges Utility, as part of the SolarWinds' Toolset Suites, is a software application that graphically displays the amount of traffic flowing through a network interface.

87.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Cisco Configuration Upload and Download Utility, technology/software that Rogers also created and/or developed.

88.     The Cisco Configuration Upload and Download Utility, as part of the SolarWinds' Toolset Suites, is a software application that facilitates the upload and download of configuration files from Cisco brand network equipment.

89.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the CPU Gauge Utility, technology/software that Rogers also created and/or developed.

90.     The CPU Gauge Utility, as part of the SolarWinds' Toolset Suites, is a software application that graphically displays the current load level of the central processor on computer or network devices.

91.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the DNS Analyzer Utility, technology/software that Rogers also created and/or developed.

92.     The DNS Analyzer Utility, as part of the SolarWinds' Toolset Suites, is a

17

software application that graphically displays the path of Domain Name Server ("DNS") resolution. This path can be used to verify and diagnose the incorrect configuration of DNS name servers. DNS is used to look up the IP address of a network device, similar to how the white pages of a phone book are used to look up the phone number of a person.

93.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the DNS Audit Utility, technology/software that Rogers also created and/or developed.

94.     The DNS Audit Utility, as part of the SolarWinds' Toolset Suites, is a software application used to verify and reconcile the forward and reverse Domain Name Service ("DNS") information for a range of Internet Protocol Addresses ("IP Addresses"). A forward DNS Lookup is used to translate a device name to an IP Address. A reverse DNS Lookup is used to translate an IP Address to a host name.

95.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the DNS/WHOIS Resolver Utility, technology/software that Rogers also created and/or developed.

96.     The DNS/WHOIS Resolver Utility, as part of the SolarWinds' Toolset Suites, is a software application used to display the Domain Name Service ("DNS") and WHOIS information on a specified Internet Protocol Address ("IP Address"). WHOIS is a global database that contains who has been assigned a range of IP Addresses on the Internet.

97.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the IP Network Browser Utility, technology/software that Rogers also created and/or developed.

98.     The IP Network Browser Utility, as part of the SolarWinds' Toolset Suites, is a

software application tool used to discover, inventory, and display properties of the devices connected to a computer network.

99.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Network Performance Monitor Utility, technology/software that Rogers also created and/or developed.

100.     The Network Performance Monitor Utility, as part of the SolarWinds' Toolset Suites, is a software application used to monitor the health of computers and computer network hardware, maintains a history of the health measurements, and alerts people if the health is below acceptable levels.  The Network Performance Monitor Utility also allows users to query the historical data of health measurements, displaying charts and historical graphs of the history of the monitored devices.  This Network Performance Monitor Utility is a single user desktop version of the Orion System Manager combined with the Orion Poller.

101.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Network Sonar Utility, technology/software that Rogers also created and/or developed.

102.     The Network Sonar Utility, as part of the SolarWinds' Toolset Suites, is a software application used to scan a range of Internet Protocol Addresses ("IP Addresses") and build a database with information about the devices associated with those IP Addresses. Information stored about each device includes the type of device, the type of network interfaces on the device, and the addresses of the network interfaces.

103.     Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the SPAM Blacklist Utility, technology/software that Rogers also created and/or developed.

19

104.    The SPAM Blacklist Utility, as part of the SolarWinds' Toolset Suites, is a software application used to check if the Internet Protocol Address of a computer used to send email has been "Blacklisted" as a source of SPAM.   SPAM are email messages that are considered junk-email or unsolicited commercial email.

105.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Layer 2 and Layer 3 Switch Port Mapper Utility, technology/software that Rogers also created and/or developed.

106.    The Layer 2 and Layer 3 Switch Port Mapper ("Switch Port Mapper") Utility, as part of the SolarWinds' Toolset Suites, is a software application used to map and display what devices are connected to a network access switch, map the devices back to its Internet Protocol Addresses, and map the Internet Protocol address back to a device's name.

107.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Desktop Syslog Message Receiving Utility, technology/software that Rogers also created and/or developed.

108.    The Desktop Syslog Message Receiving Utility, as part of the SolarWinds' Toolset Suites, is a software application used to receive and display system logging ("Syslog") messages.   Syslog messages are used to communicate system events from computers and computer network infrastructure devices (for example "routers" and "switches").   The Desktop Syslog Message Receiving Utility can filter and store Syslog messages in a local database for later searching.

109.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Traceroute Discovery Utility, technology/software that Rogers also created and/or developed.

20

110.   The Traceroute Discovery Utility, as part of the SolarWinds' Toolset Suites, is a software application used to map the path used through a computer network, router by router, when transmitting a message from one computer to another computer across the network. After the router of the path has been determined, each router is sent a message requesting a replying echoing so the travel time to each router can be measured.

111.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Desktop Trivial File Transfer Protocol Utility, technology/software that Rogers also created and/or developed.

112.   The Desktop Trivial File Transfer Protocol ("TFTP") Utility, as part of the SolarWinds' Toolset Suites, is a software application used for sending and receiving small files across computer networks. The rules for sending files via Trivial File Transfer are defined by The Internet Engineering Task Force (a standards organization for Internet-based communication) in Request For Comments document number 1350.

113.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Wide Area Network Test Traffic Generator Utility (aka "WAN Killer"), technology/software that Rogers also created and/or developed.

114.   The Wide Area Network Test Traffic Generator Utility (aka "WAN Killer"), as part of the SolarWinds' Toolset Suites, is a software application which is used to create test traffic between two computers on a computer network. The test traffic can be used to validate how the network devices ("routers and switches") located between the two computers handle large amounts of network traffic.

115.   Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the Wake-On-LAN Remote PC Power On Utility, technology/software that

Rogers also created and/or developed.

116.    The Wake-On-LAN Remote PC Power On Utility, as part of the SolarWinds' Toolset Suites, is a software application used to transmit a message to a powered off network-attached computer requesting the computer to power on.

117.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the SolarWinds' Cirrus Configuration Manager, technology/software that Rogers also created and/or developed.

118.    The SolarWinds' Cirrus Configuration Manager is a software application used to make configuration changes to network devices. In addition, it can also make backup copies of device configurations and keep a history of device configuration so differences or changes can be displayed. The Cirrus Configuration Manager can also inventory network devices using the SolarWinds' Inventory Engine, allowing hardware configuration's reports to be generated.

119.    Plaintiff Rogers is also the co-author (with SolarWinds) and co-owner of the proprietary rights to the SolarWinds' Inventory Engine, technology/software that Rogers also created and/or developed.

120.    The SolarWinds' Inventory Engine, as part of the SolarWinds' Cirrus Configuration Manager, is a software component used to inventory a computer or network device based on a set of textual inventory specification files and store the results in a database. The inventory specification files describe what properties of a device should be read and where in the database the read values should be stored.

121.    Defendant SolarWinds marketed and exploited the commercial value of the above-referenced Rogers/SolarWinds Intellectual Property through various software products that SolarWinds licensed under various titles that included names such as those mentioned

above, i.e. "Toolset," "Orion," and "Cirrus."

122.    Over the course of Plaintiff Rogers' employment at SolarWinds, Defendant Yonce repeatedly confirmed, renewed, and reassured Rogers regarding the continued validity of Yonce's and SolarWinds' compensation-related representation -- that once the sale occurred, Rogers' efforts would be financially rewarded by sharing in, and receiving a substantial portion of, the financial pay-out from the sale.

123.    Plaintiff Rogers reasonably believed and relied on Defendants Yonce's and SolarWinds' reassurances and reaffirmations, and Rogers had a reasonable expectation of being so compensated for his valuable creative and other professional services.

124.    On information and belief, in or about late 2005-2006 Defendant Yonce sold the majority of his ownership in SolarWinds to several persons or organizations, including venture/investment firms Bain Capital and Insight Ventures (collectively the "Bain-Insight Group(s)"), as well as the Austin Ventures Group.

125.    Defendant Yonce knew that Plaintiff Rogers trusted him, and that Rogers was fully dependent on Yonce to make full, candid, and truthful disclosures regarding the status of, and all material aspects concerning, Yonce's sale of his majority ownership in SolarWinds.

126.    Nevertheless, Defendant Yonce did not truthfully or fully disclose to Plaintiff Rogers the status or terms of his sale(s) to these persons or firms.

127.    Instead, Defendant Yonce intentionally concealed and misrepresented these facts from Rogers.

128.    Defendant Yonce intended to mislead and deceive Plaintiff Rogers about his above-referenced compensation-related representations and promises when he made those representations and promises to Rogers.

129.   Defendant Yonce also intended to mislead and deceive Plaintiff Rogers about Yonce's sale(s) of his majority ownership in SolarWinds in or about late 2005-2006.

130.   Plaintiff Rogers was misled, to his detriment, by Defendants Yonce's and SolarWinds' above-referenced deceptions, concealments, and misrepresentations.

131.   Defendant Yonce owed legal duties and fiduciary duties to Plaintiff Rogers (a) to candidly disclose the fact and terms of the sale(s) of his majority ownership interest in SolarWinds to the persons or firms such as the Bain-Insight Group(s) and the Austin Ventures Group, and (b) to truthfully state and fulfill his above-described representations, compensation-related assurances, and payment-related promises.

132.   On information and belief Defendant D.C. Yonce has received, or is about to receive, a substantial nine-figure sum of money and other financial remuneration from his recent above-referenced sale(s) of ownership in SolarWinds.

133.   Defendants Yonce and SolarWinds have failed and refused to fulfill the above-described promises and compensation-related agreement with Plaintiff Rogers, but instead have breached their contractual promises and agreements with Plaintiff Rogers.

134.   Defendants Yonce and SolarWinds therefore committed a substantial material breach of their contract and Agreement with Plaintiff Rogers.

135.   In addition, Defendants Yonce and SolarWinds breached Oklahoma's Labor Protection Laws, 40 Okla. Stat. §§165.1 *et. seq.*, by wrongfully inducing Plaintiff Rogers to change his place of employment through their false representations, and by failing to honor, pay, and fulfill the above-described promises, assurances, representations and employment-related compensation agreement.

136.   Defendants Yonce and SolarWinds also breached their fiduciary duties to Plaintiff

Rogers, and knowingly assisted one another to breach their fiduciary duties to Rogers, relating to the above-described compensation promises and sale-of-business assurances.

137.   Defendant SolarWinds has received substantial revenue, financial benefits, and sums of money from various business customers and third parties to whom SolarWinds has licensed the Rogers/SolarWinds Intellectual Property, and SolarWinds has thereby realized significant economic profits from those transactions.

138.   As co-authors and co-owners of the Rogers/SolarWinds Intellectual Property, Defendant SolarWinds owes Rogers a duty to account for all monetary sums, financial proceeds, and profits that it has realized or obtained from the licensing, commercial exploitation, and other uses of the Rogers/SolarWinds Intellectual Property, as well as from all other commercial works that SolarWinds has adapted or derived from the Rogers/SolarWinds Intellectual Property.

139.   As co-authors and co-owners of the Rogers/SolarWinds Intellectual Property, Defendant SolarWinds holds all such sums, profits and proceeds in trust for Plaintiff Rogers.

140.   As co-authors and co-owners, Defendant SolarWinds also owes Plaintiff Rogers half of all profits that it has realized, earned, received, or obtained from the licensing and other uses of the Rogers/SolarWinds Intellectual Property, as well as from any other commercial works that SolarWinds has adapted or derived therefrom.

141.   Defendant SolarWinds also owes Plaintiff Rogers a fiduciary duty to hold, account, and pay half of said profits to and for Plaintiff Rogers.

142.   Defendant SolarWinds has failed to account to Plaintiff Rogers, and it has also failed to pay half of any such profits to Rogers.

### Count I: Breach of Contract/Quasi-Contract (*Quantum Meruit & Quantum Valebant*)

143.   Plaintiff adopts by reference the allegations in paragraphs 1 through 142 above.

144.   Plaintiff Rogers has been damaged as a result of the breach of the Agreement and contract, or by the breach of the implied or quasi-contract, committed by Defendants SolarWinds and Yonce, and said Defendants have also been unjustly enriched.

145.   Defendants SolarWinds and Yonce are therefore liable to Plaintiff Rogers for said Defendants' breach of their Agreement and contract, or their breach of implied or quasi-contract.

### Count II: Violation of Oklahoma Labor Protection Laws

146.   Plaintiff adopts by reference the allegations in paragraphs 1 through 145 above.

147.   Plaintiff Rogers has been damaged as a result of the violations of Oklahoma's Labor Protection Laws, 40 Okla. Stat. §§165.1, et. seq., by Defendants SolarWinds and Yonce.

148.   Defendants SolarWinds and Yonce are therefore liable to Plaintiff Rogers for said Defendants' violation of Oklahoma's Labor Protection Laws.

### Count III: Promissory & Equitable Estoppel

149.   Plaintiff adopts by reference the allegations in paragraphs 1 through 148 above.

150.   Defendants Yonce and SolarWinds are estopped to deny that they are obligated to pay the compensation they promised and represented to Plaintiff Rogers he would receive from the sale of Yonce's majority ownership in SolarWinds.

151.   Defendants SolarWinds and Yonce are therefore liable to Plaintiff Rogers for the share of the proceeds from the sale of Yonce's majority ownership in SolarWinds that belongs to Plaintiff Rogers.

## Count IV: Breach of Covenant of Good Faith & Fair Dealing

152.    Plaintiff adopts by reference the allegations in paragraphs 1 through 151 above.

153.    Defendants Yonce and SolarWinds owed duties of good faith and fair dealing to Plaintiff Rogers which they have both breached.

154.    As a result thereof, Plaintiff Rogers has been damaged and Defendants Yonce and SolarWinds are therefore liable to Plaintiff Rogers for their breach of the covenant of good faith and fair dealing.

## Count V: Fraud & Constructive Fraud

155.    Plaintiff adopts by reference the allegations in paragraphs 1 through 154 above.

156.    Plaintiff Rogers has been damaged as a result of the fraud and constructive fraud committed by Defendants Yonce and SolarWinds.

157.    Defendants SolarWinds and Yonce are therefore liable to Plaintiff Rogers for said Defendants' fraud and constructive fraud.

## Count VI:  Constructive Trust/Equitable Lien

158.    Plaintiff adopts by reference the allegations in paragraphs 1 through 157 above.

159.    Plaintiff Rogers has an equitable lien against the sums he is owed from the sale of Defendant Yonce's majority ownership interest in SolarWinds, and he is further entitled to a judicial determination and declaration that any such sums, monies, or proceeds from the sale of Defendant Yonce's majority ownership in SolarWinds are subject to a constructive trust in favor of Plaintiff Rogers.

## Count VII: Unjust Enrichment And Accounting

160.    Plaintiff adopts by reference the allegations in paragraphs 1 through 159 above.

161.    Defendant SolarWinds has been unjustly enriched by its licensing, use, and

commercial exploitation of the Rogers/SolarWinds Intellectual Property, and Defendant SolarWinds is therefore required to (a) provide Plaintiff Rogers a full and complete accounting of all such revenue, sums and profits that it has received from such licensing, use or exploitation, and (b) to pay Plaintiff Rogers one-half (½) of all such profits.

162.    Defendant SolarWinds is therefore liable to Plaintiff Rogers for a full accounting and for one-half (½) of the profits it has earned or received from the Rogers/SolarWinds Intellectual Property.

### Count VIII: Breach of Fiduciary Duties & Knowingly Assisting Breach

163.    Plaintiff adopts by reference the allegations in paragraphs 1 through 162 above.

164.    Plaintiff Rogers has been damaged as a result of Defendants Yonce and SolarWinds breach of fiduciary duties, as well as their having knowingly assisting one another to breach their fiduciary duties to Plaintiff.

165.    Defendants SolarWinds and Yonce are therefore liable to Plaintiff Rogers for said Defendants' breach of their fiduciary duties, as well as for their knowingly assisting each other to breach their fiduciary duties to Plaintiff.

### Count IX: Constructive Trust/Equitable Lien

166.    Plaintiff adopts by reference the allegations in paragraphs 1 through 165 above.

167.    Plaintiff Rogers has an equitable lien against one-half (½) of the profits that Defendant SolarWinds has received, and that it henceforth receives, from the licensing, use or other commercial exploitation of the Rogers/SolarWinds Intellectual Property.

168.    Plaintiff Rogers is entitled to a judicial determination and declaration that one-half (½) of the profits that Defendant SolarWinds has realized or received, and that it henceforth realizes or receives, are subject to a constructive trust in favor of Plaintiff Rogers.

28

**Prayer for Relief**

169.    Accordingly, Plaintiff Rogers prays for a Judgment, Order and Decree against Defendants Yonce and SolarWinds as follows:

a.      Plaintiff Rogers prays for Judgment on Count I against Defendants Yonce and SolarWinds for actual and compensatory damages, or restitution, in excess of $10,000, plus interest, attorneys' fees and costs.

b.      Plaintiff Rogers prays for Judgment on Count II against Defendants Yonce and SolarWinds for actual and compensatory damages in excess of $10,000, plus interest, attorneys' fees and costs.

c.      Plaintiff Rogers prays for Judgment on Count III against Defendants Yonce and SolarWinds for actual and compensatory damages in excess of $10,000, plus interest, attorneys' fees and costs.

d.      Plaintiff Rogers prays for Judgment on Count IV against Defendants Yonce and SolarWinds for actual and compensatory damages in excess of $10,000, plus interest, attorneys' fees and costs.

e.      Plaintiff Rogers prays for Judgment on Count V against Defendants Yonce and SolarWinds for actual and compensatory damages, as well as punitive damages, in excess of $10,000, plus interest, attorneys' fees and costs.

f.      Plaintiff Rogers prays for an Order and Judgment on Count VI against Defendants Yonce and SolarWinds decreeing that Plaintiff has an equitable lien against, and that a constructive trust is imposed upon, all sums, monies and proceeds from Defendant Yonce's sale of his ownership interest in SolarWinds, plus interest, attorneys' fees and costs.

g.      Plaintiff Rogers prays for an Order and Judgment on Count VII

compelling Defendant SolarWinds to render a full accounting and for one-half (½) of all profits it has realized, earned or received from the license, use or commercial exploitation of the Rogers/SolarWinds Intellectual Property, as well as from any adaptions or other works derived therefrom, plus interest, attorneys fees and costs.

        h.    Plaintiff Rogers prays for an Order and Judgment on Count VIII against Defendants SolarWinds and Yonce for actual and compensatory damages, as well as punitive damages, in excess of $10,000, plus interest, attorneys' fees, and costs.

        i.    Plaintiff Rogers prays for an Order and Judgment on Count IX against Defendant SolarWinds decreeing that Plaintiff has an equitable lien against, and that a constructive trust has been imposed upon, one-half (½) of all profits SolarWinds has realized, earned, or received from the license, use, or commercial exploitation of the Rogers/SolarWinds Intellectual Property, as well as from any adaptions or other works derived therefrom, plus interest, attorneys' fees and costs.

    170.    Plaintiff Rogers further prays for such other legal and equitable relief to which he may be entitled.

                    Respectfully submitted,

                    _____

                    Gerald L. Hilsher, (OBA #4218)
                    John A. Burkhardt, (OBA #1336)
                    BOONE, SMITH, DAVIS, HURST & DICKMAN
                    500 ONEOK Plaza
                    100 West 5th Street
                    Tulsa, OK  74103-4288
                    Telephone (918) 587-0000
                    Facsimile (918) 599-9317

                    Attorneys for Plaintiff Brian K. Rogers

## SOLARWINDS.NET EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

In consideration of my employment with SolarWinds.Net ("Company") and in consideration of the compensation paid to me, the sufficiency of which I hereby acknowledge, I, Brian Rogers ("Employee"), enter into this Employee Proprietary Information and Inventions Agreement ("Agreement") made and entered into as of the 1 day of September 2001 ("Effective Date") with and for the benefit of Company.

Within this agreement "Confidential Information" shall mean information or material (a) proprietary to the Company and not known outside the Company, including, without limitation, information originated, developed or reduced to practice in whole or in part, by Employee or (b) that is received in confidence by or for the Company from any other person or entity subject to a confidentiality and/or proprietary information agreement executed by and between the Company or the person or entity. "Confidential Information" as used here shall mean but is not limited to, (i) algorithms, trade secrets, computer programs, designs, processes, data, specifications, techniques, inventions (whether patentable or not) and works of authorship, including software and source code, (ii) any and all business information, including, without limitation, unpublished financial information, business plans, customer lists and customer information, and product development plans. Confidential Information shall not include information which (i) has legally and properly entered the public domain through a source other than Employee and through no fault of Employee's; (ii) was in the Employee's possession prior to the date it was disclosed to any other party; (iii) is disclosed to the Employee by a third party which is not, to the Employee's knowledge, prohibited from disclosing such information by a legal or fiduciary duty to the disclosing party; (iv) is independently developed by the Employee or any of its representatives without the use of any Confidential Information; (v) is disclosed because the Company gave permission in writing to Employee that disclosure is allowed or (vi) was rightfully known to Employee or was rightfully in Employee's possession, without an obligation to keep it confidential, prior to the commencement of employment with the Company.

"Company Materials" shall mean (a) all equipment, files, and software programs belonging to the Company, (b) all data, documents, records, software programs, engineer logs, media or other materials or tangible items that contain or embody Confidential Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by Employee or others. i and (c) notebooks, customer lists, computer disks, printouts and other documents.

"Intellectual Property" shall mean any and all intellectual property and industrial property rights and all other proprietary rights, including, without limitation, patents, patent rights, copyrights, works of authorship, trademarks and trade secrets.

### 1. CONFIDENTIAL INFORMATION.

Ownership. Employee agrees that, as between the Company and Employee, all Confidential Information and Company Materials and any Intellectual Property related thereto shall be the sole property of the Company unless ownership of Confidential Information, Company Materials and Intellectual Property are granted to Employee through an executed written definitive agreement by and between the Employee and the Company. Employee agrees not to remove or cause the removal of any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as required in connection with the performance of Employee's duties for the Company. Employee further agrees, immediately upon the termination of employment for any reason or during employment if so requested by the Company, to promptly return or destroy and certify destruction all Confidential Information and Company Materials.

Use. Employee agrees to use the Confidential Information in connection with the performance of Employee's duties for the Company. During the Employee's relationship with the Company, Employee shall take reasonable means to protect all Confidential Information and shall not disclose or provide access to the same to anyone other than employees or, at the direction of the Company, authorized agents of the Company in connection with the performance of Employee's duties for the Company or if Employee is requested or required (by deposition, interrogatory, request for documents, subpoena, civil investigative demand regulatory agency or other governmental entity, including but not limited to the Internal Revenue Service ("IRS"), United States Department of Justice ("DOJ"), United States Patent Office ("Patent Office"), the Department of Labor ("DOL") and any other similar state agency exercising jurisdiction over the Company or subject matter in question or similar process) to disclose any of the Confidential Information, the Employee shall provide the Company with prompt written notice of such request or requirement and shall cooperate with the Company so it may seek a protective order or other appropriate remedy. Subject to the issuance of a protective order or other remedy being obtained, the receiving the Employee may produce such Confidential Information the Confidential Information is responsive to discovery requests or demands in the respective proceeding(s), but the receiving party shall exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information.



**EXHIBIT**

"A"

## 2.  OWNERSHIP AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS.

Ownership of Intellectual Property.  Employee hereby agrees that all Intellectual Property relating in any manner to work performed by or for Employee as part of the performance of Employee's duties to the Company shall be owned exclusively by the Company ("Company Intellectual Property"), and that the Company may, in accordance with applicable state and federal laws and regulations take steps necessary and appropriate to protect and enforce such Company Intellectual Property and rights therein. Furthermore, without limiting the foregoing, any such Company Intellectual Property created by Employee and related to the actual or proposed business of the Company shall be deemed "works made for hire" and the Company shall be deemed the co-author thereof.

## 3.  GENERAL PROVISIONS

Term.  The obligations set forth in this Agreement shall terminate one year after the termination of Employee's employment with the Company.  Unless otherwise agreed to in writing between Employee and the Company, the employment relationship or contract between Employee and the Company, as applicable, is on an "at will" basis, and nothing herein shall be construed to confer upon Employee any rights to continued employment by the Company that Employee would not otherwise have.

Non-Compete.  Employee agrees that during employment with the Company Employee will not engage in any activity that is in any way competitive with the business or that would otherwise conflict with the Company, and will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or contemplated business of the Company

Assignment of Agreement.  This Agreement may be assigned, in whole or in part, by the Company to any third party and shall inure to the benefit of any and all of the Company's successors and assigns.  However, because of the unique and personal nature of the services and duties of Employee, which form at least a part of Employee's duties for the Company, Employee may not assign any obligations, or portions thereof, agreed to by Employee under this Agreement.  In the event Company assigns the Agreement, Employee, in his sole discretion, shall have the right to terminate his employment with Company upon assignment to another company or entity.

Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Oklahoma without regard to the conflict of laws provisions thereof.

Severability; Waiver.  If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, it shall be construed by limiting and reducing such provision so as to be enforceable to the extent compatible with the applicable law and this Agreement shall otherwise remain in full force and effect. If the laws of the State of Oklahoma prohibit non-compete agreements without a valid employee agreement with good and valuable consideration this Agreement shall be null and void and have no force or effect.  This Agreement constitutes the full and complete understanding of the parties with respect to Confidential Information, Intellectual Property, Non-Competition and supersedes all oral or written communications, understanding agreements concerning Confidential Information, Intellectual Property, Non-Competition.  This Agreement may not be amended, modified or supplemented except by written agreement signed by both the Employee and Company hereto.

Employee has read this agreement carefully and understands and accepts the terms and obligations which it imposes upon Employee

IN WITNESS WHEREOF, Employee and Company have executed this Agreement as of the Effective Date.

**Brian K. Rogers:**

Signature: _Brian K Rogers_

Name (printed): Brian K. Rogers

Title: _Senior Technologist_

Date: _19 Jan 2005_

**SolarWinds.Net:**

Signature: _Douglas Gompers_

Name (printed): _Doug Robens_

Officer Title: _Vice President_

Date: _Jan 21, 2005_

I, Sally Howe Smith, Court Clerk, for Tulsa County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears on record in the Court Clerk's Office of Tulsa County, Oklahoma, this

DEC 1 4 2007

By _Rebecca Demps_
Deputy